**URSCHEL et al. v. JONES.**

Civ. No. 3250.

United States District Court
W. D. Oklahoma.

Jan. 10, 1949.

Richardson, Shartel, Cochran & Pruet, of Oklahoma City, Okl., for plaintiffs.

Robert E. Shelton, U. S. Atty., of Oklahoma City, Okl., and Lester L. Gibson, Sp. Asst. to Atty. Gen., for defendant.

CHANDLER, District Judge.

Upon the pleadings, admissions, stipulations and evidence herein, plaintiffs request the court to make the following findings of fact and conclusions of law, to-wit:

Findings of Fact

1. Plaintiffs C. F. Urschel, Arthur A. Seeligson and Berenice S. Urschel are testamentary trustees of three trusts created by the will of Thomas B. Slick, deceased, for the use and benefit of the latter's three children, namely, Tom B. Slick, Jr., Betty Slick Moorman, and Earl F. Slick, and they sue in that capacity. Berenice S. Urschel is the widow and a legatee of said Thomas B. Slick, and she also sues individually. The purpose of the suit is to recover alleged over-payments of federal income taxes for the year 1941.

2. Defendant H. C. Jones is now and since prior to the year 1941 has been the duly appointed, qualified and acting Collector of Internal Revenue of the United States for the District of Oklahoma, and all his acts herein complained of were done under the purported authority of that office.

3. The ultimate question for determination is whether the respective plaintiffs' proportionate parts of a profit of $1,593,-000, received by them in 1941 on account of a contingent claim which they had previously held against Sinclair Prairie Oil Company, was taxable against plaintiffs as ordinary income or only as capital gain.

4. Thomas B. Slick was a citizen of the United States and resided in Oklahoma at the time of and for many years prior to his death. He was a successful oil producer, and on March 14, 1929, he owned individually many oil and gas leases in the states of Kansas, Oklahoma, Texas and Louisiana. Tom Slick, Inc., was a corporation engaged in the production of oil, and it also owned many oil and gas leases in the states above mentioned. Thomas B. Slick was its president and owned 7/8 of its capital stock, and C. F. Urschel and E. E. Kirkpatrick each owned

$\frac{1}{16}$ thereof. In contemplation of the sale hereinafter mentioned, an agreement was made between Slick, Urschel and Kirkpatrick whereby Slick was empowered to include with his own Urschel's and Kirkpatrick's stock in a sale of the stock of Tom Slick, Inc. On March 14, 1929, the holdings of Thomas B. Slick individually and Tom Slick, Inc., together, totaled about 10,000 acres of developed or producing leases, and 500,000 acres of undeveloped leases, situated in the states mentioned, and tank farms and tankage, and approximately 2,500,000 barrels of oil theretofore produced. There were about 300 wells upon the developed leases having a total open flow volume of 34,500 barrels of oil per day and a net average production of 27,000 barrels per day, having a market value of $1.25 per barrel. Neither Slick nor Tom Slick, Inc., was a trader or dealer in oil leases, but both were in the business of producing oil, and acquired their leases for that purpose and not for the purpose of sale.

5. On March 14, 1929, Thomas B. Slick and Prairie Oil and Gas Company, a corporation, entered into a written contract whereby Slick sold and Prairie purchased (1) all oil and gas leases owned by both Slick and Tom Slick, Inc., on March 1, 1929, in the states of Kansas, Oklahoma, Texas and Louisiana, excepting an undivided half interest in the undeveloped leases, which undivided half interest Slick retained for himself; (2) all tank farms and tankage owned by Slick and Tom Slick, Inc., in and on which their storage oil was situated; and (3) the oil therein amounting to approximately 2,500,000 barrels. The producing leases were described in Exhibit A to the contract, and the undeveloped leases in Exhibit B thereto. The contract stated that some of the properties were owned by Tom Slick, Inc., but that Slick controlled that company through his stock ownership, and had authority, if he elected to consummate the sale in that manner, to assign and deliver to Prairie 100% of the capital stock of Tom Slick, Inc., after having paid and discharged all debts, liabilities, and demands against it and having received the cash, bills and accounts receivable due it, the transfer of the stock to be in lieu of the assignment and trans-

fer of the properties held by Tom Slick, Inc., and referred to in Exhibits A and B to the contract. That alternative plan was adopted, and all the stock in Tom Slick, Inc., was assigned and transferred to Prairie in lieu of transferring the properties owned by it. The net result of the transaction as finally consummated was that Slick sold to Prairie 100% of the capital stock of Tom Slick, Inc., all of Slick's producing leases, an undivided half interest in the non-producing leases, the tank farms and tankage, and the oil in storage. It was provided that Slick should pay all operating expenses to March 1, 1929, and that Prairie should pay all such expenses and have all production from and after that date. Also it was provided that Slick should have the right to fix the value of the capital stock of Tom Slick, Inc., and of his individual producing properties and undeveloped leases, and to make such exchanges of leases as between himself and Tom Slick, Inc., as he might desire. Under that provision Slick made exchanges with Tom Slick, Inc., of certain of his individual producing leases for such of Tom Slick, Inc.'s, undeveloped leases as was necessary to give Slick, upon the consummation of the sale, a retained undivided half interest in all of the undeveloped leases of both Slick and Tom Slick, Inc., which undeveloped leases the contract provided should be developed and operated by Prairie for the equal benefit of both parties under a written operating agreement executed by the parties and attached to the contract as Exhibit C.

6. The consideration for the sale, as stated in the contract, was "$27,500,000 cash and an additional $6,000,000 to be paid as hereinafter provided." The provision with reference to the payment of the additional $6,000,000 was as follows:

"When and if the leases, producing and nonproducing, herein transferred shall have produced for the party of the second part from and after March 1st, 1929, Thirty Million ($30,000,000) Dollars worth of oil at the posted market prices (whether the oil is stored or sold) then and in that event the party of the second part agrees to pay to the party of the first part an additional sum of Six Million ($6,000,-000) Dollars cash, which payment shall be

made within thirty (30) days after the date that the properties herein referred to have produced and sold or stored the said $30,000,000 worth of oil, and bear interest at the rate of six (6%) per cent per annum if not paid within such period. In the event it becomes necessary to bring suit to recover the said $6,000,000 the party of the second part shall be liable to the party of the first part for reasonable attorneys fees. Should any of the leases herein transferred be renewed or new leases taken on the same land in any name for the benefit of the party of the second part produce oil for the party of the second part, such oil shall be included in the calculation of the $30,000,000 aforesaid and this will also include any interest acquired in other acreage from pools to which the party of the first part's leases have been contributed in which oil is set aside to the credit of the party of the second part as its portion of pooled interests, for and on account of said leases of the party of the first part so contributed to the pool.

"Daily production reports of principal producing leases covered by this contract, with certified statements each three months showing net barrels and money received from the producing properties described in this paragraph (No. Twenty First) above until the final $6,000,000 is paid, shall be made to the party of the first part. Upon failure to furnish such quarterly statements after three successive written demands for same made at intervals of thirty (30) days, One Million ($1,000,000) Dollars of the final $6,000,000 shall be due and payable on demand, the balance being payable as in the contract provided. The party of the first part is to have the right at any time without interfering with operations to enter upon any of the properties to gauge and check the production therefrom and also the party of the first part shall have the right at all reasonable times to inspect the books and accounts affecting all properties covered by this contract."

7. The additional $6,000,000 conditionally promised to be paid was to be for and on account of the leases, producing and nonproducing, acquired from Slick directly and through the purchase of the stock of Tom Slick, Inc. The provisions of Sec. 21 of the contract were equivalent to Slick's and Prairie's saying that they did not then know the full value of the leases, and that if their subsequent development and operation showed that they were worth more by their production of as much as $30,000,000 worth of oil, then $6,000,000 additional should be paid for them.

8. The sale was consummated and the cash consideration of $27,500,000 was fully paid to Slick before the end of the year 1929, out of which Slick paid to C. F. Urschel and E. E. Kirkpatrick the portion due them by virtue of their ownership of $\frac{1}{8}$ of the capital stock of Tom Slick, Inc. In due time Slick filed his federal income tax return for the year 1929, showing his profit from said sale and his net income from other sources during the year 1929, in which, because it was conditional and then had no "fair market value", no value was attributed to Prairie's conditional $6,000,000 obligation. Slick's income taxes for the year 1929 were finally determined and assessed by the Internal Revenue Department on June 26, 1931, after Slick's death, and the Department therein determined that for the most part Slick's sale under the contract of March 14, 1929, was a sale of capital assets, that his capital net gain was $22,503,242.35, that such of his profit from the sale as was not capital gain was less than his ordinary net losses as adjusted, that his capital net gain subject to taxation at 12½% was $17,443,143.31, and that his total tax liability, all of which was assessed at capital gains rates, was $2,180,257.91. Those taxes were paid and Slick's taxation for the year 1929 was closed on that basis.

9. Slick died on August 16, 1930, leaving a will in which he devised to his wife, Berenice S. Slick, now Urschel, the homestead in Oklahoma City, and in which he devised and bequeathed all the rest, residue and remainder of his estate to the plaintiffs C. F. Urschel, Arthur A. Seeligson and Berenice S. Urschel, as trustees in trust for the benefit of Berenice S. Urschel, and his three children, Tom B. Slick, Jr., Betty Slick, now Betty Slick Moorman, and Earl Slick, $\frac{1}{3}$ of the trust estate to be for the benefit of Berenice S. Urschel and the

remaining ⅔ for the benefit of said three children in equal parts. The will gave the trustees power to transfer and convey any property, real or personal, belonging to the trust estates and to invest and re-invest the same, but provided that C. F. Urschel, one of said trustees, "so long as he shall live, shall have the final say as to when and upon what conditions any of my property, either real or personal, shall be sold, conveyed, encumbered, leased or invested in any manner whatsoever, and that unless the said C. F. Urschel agrees, no transaction relative to any of my property shall be executed and carried out." The will provided that the ⅓ of the property devised and bequeathed in trust for Berenice S. Urschel should be finally delivered to her, and such delivery had been made and the trust as to her had terminated prior to the year 1936. By the will, which was duly probated, and by appointment of the proper court, C. F. Urschel, Arthur A. Seeligson and Berenice S. Urschel became and acted as the executors of the will. Administration was had, and in 1932 the court ordered a partial distribution of the estate, including therein the conditional obligation, and the executors immediately distributed said conditional obligation to the trustees. The obligation had no fair market value at that time. Administration was closed in a later year, and all of Slick's estate not theretofore distributed remaining after the payment of his debts, state and federal estate taxes and the expenses of administration, was distributed in accordance with the will, ⅓ to the trustees for the benefit of Berenice S. Urschel and ⅔ for the benefit of each of Slick's children. The trusts for the children are still continuing.

10. Within the time provided by law, the executors filed the federal estate tax return for the estate of Thomas B. Slick, deceased, in which, because it then had no fair market value, no value was attributed to Prairie's $6,000,000 conditional obligation hereinbefore set out; and the amount of the estate taxes due and owing by Slick's estate was finally determined by the Internal Revenue Department without attributing any value to said conditional obligation, and the same was paid in due course.

11. In March, 1932, Consolidated Oil Corporation and certain of its subsidiaries acquired all of the assets of The Prairie Oil and Gas Company, and Sinclair Prairie Oil Company, a wholly owned subsidiary of Consolidated, assumed Prairie's conditional obligation to pay to Slick's estate the additional sum of $6,000,000 if and when the leases, producing and non-producing, acquired by Prairie from Slick and those owned by Tom Slick, Inc., should have produced $30,000,000 worth of oil at the market prices thereof, as set out in paragraph 21 of the contract of March 14, 1929, between Slick and Prairie.

12. Transwestern Oil Company was a Delaware corporation organized in 1936, having a capital stock of 750,000 shares of the par value of $10 each, all of which was sold and issued at $12, and the $2 per share in excess of par constituted a paid-in surplus. It was engaged in the business of producing oil, and its principal office was in San Antonio, Texas. Arthur A. Seeligson and his family, and Berenice S. Urschel individually, and the trusts, together, owned approximately 34% of its capital stock and the remainder was owned by the general public. It had approximately a thousand stockholders in various parts of the United States, and its shares were listed on the New York Curb. Seeligson was President and a director of the company. C. F. Urschel was a director but owned no stock and held no office in the company. Berenice S. Urschel was neither a director nor an officer. The company had nine directors, of whom three resided in New York and were connected with banking firms there. Only three of the directors, namely, Seeligson, Urschel and Tom B. Slick, Jr., bore any relation to or had any interest, directly or indirectly, in the Slick Trusts.

13. On December 11, 1936, plaintiffs and Transwestern entered into a written contract wherein plaintiffs agreed to sell and Transwestern to buy, as of December 1, 1936, certain of plaintiffs' leaseholds, royalties, oil payments, and other interests of whatever nature in oil and gas properties in Oklahoma, Kansas and Texas, including a half interest in the $6,000,000 conditional obligation of Sinclair-Prairie Oil Company, and all physical equipment, oil inventories,

materials and supplies, etc., and other property, all for the consideration of $9,500,000 in cash. No portion of the consideration was allocated to any of the specific properties sold, but all the properties named were sold for the lump sum of $9,500,000. That contract was carried out in accordance with its terms, and Transwestern became the owner of the property described therein, including a one-half interest in Sinclair-Prairie's conditional obligation to pay the said sum of $6,000,000. and leaving plaintiffs owning the other half interest therein.

14. During the years 1939 and 1940 Transwestern had no net profits but suffered losses, which, for tax purposes under the law as it then stood, it was entitled to carry over and offset against profits in 1941. Also, in 1941 it was indebted upon interest bearing notes in a sum exceeding a million dollars. In the latter part of 1941 it was desirous of realizing upon its half interest in the conditional obligation because, if it did so during that year, its resulting profit for tax purposes could be offset against its losses in 1939 and 1940, and thus be tax free in whole or in part, and because it desired to use the proceeds in paying its indebtedness. Mr. Seeligson therefore took up with Sinclair Prairie the matter of that company's purchasing or discounting Transwestern's half interest in the conditional obligation, and he was informed that Sinclair Prairie would be interested in purchasing or extinguishing the entire obligation, but was not interested at all in acquiring or retiring only half of it. Sinclair Prairie stated that it would give for the purchase or release of the entire obligation ten notes of Consolidated Oil Corporation, the parent company, in the principal sum of $330,000 each, bearing 2% interest, and payable at yearly intervals. That proposition was set forth in a letter from Sinclair Prairie to Transwestern dated December 17, 1941. It was first stated to Seeligson orally by H. L. Phillips, President of Sinclair Prairie, in New York, whereupon, it being necessary that the transaction be consummated before the end of the year 1941, if Transwestern was to get the benefit of the carry-over provision of the income tax law, Seeligson consulted Transwestern's New York directors, and with their approval he immediately thereafter took up with the plaintiffs the matter of Transwestern's purchasing their half interest in said conditional obligation, and his negotiations with them resulted in their agreement to sell said half interest to Transwestern for the sum of $1,593,000 cash, pursuant to which, on December 19, 1941, plaintiffs executed and delivered to Transwestern an assignment of their half interest. Thereupon, on December 22, 1941, Seeligson, in behalf of Transwestern, accepted in writing Sinclair Prairie's offer above mentioned dated December 17, 1941. Seeligson's action in purchasing plaintiffs' half interest in said conditional obligation and agreeing to pay $1,593,000 therefor was ratified and confirmed by Transwestern's Board of Directors on December 23, 1941.

15. Transwestern did its banking business in New York with Central Hanover Bank & Trust Company, and upon plaintiffs' assignment to Transwestern of their half interest in the conditional obligation, and prior to December 24, 1941, Seeligson arranged with that bank for Transwestern to borrow from it the sum of $1,600,000 upon Transwestern's promissory note payable on or before January 3, 1942, and bearing interest at 1½% per annum, with which it was intended to pay plaintiffs for their half interest in said conditional obligation. Seeligson reported that arrangement at a meeting of the Executive Committee of Transwestern held on December 22, 1941, whereupon the Committee adopted a resolution authorizing and directing Seeligson as President or Orba Greenwood as Treasurer of the Company to execute and deliver said promissory note in the Company's name and behalf to Central Hanover Bank & Trust Company, and authorizing and directing the bank to credit Transwestern with the sum borrowed; and said note was executed on December 24, 1941, was mailed to Central Hanover Bank & Trust Company on that date and was received and the proceeds thereof credited to Transwestern's account on December 26, 1941. On December 24, 1941, Transwestern sent from its office in San Antonio to Berenice S. Urschel in Oklahoma City its check dated December 24, 1941, upon Central Hanover Bank & Trust Company, in the sum of $531,000, and to the trustees in

Oklahoma City its three checks bearing the same date and drawn upon the same bank in the sum of $354,000 each, all of which checks were received and endorsed by the respective payees and were forwarded by them in letters from Oklahoma City dated December 27, 1941, to Central Hanover Bank & Trust Company for deposit to their credit, and they were received and credited on December 29, 1941.

16. Transwestern's written release and surrender of the conditional claim against Sinclair Prairie was prepared and was submitted to Transwestern's Board of Directors at a meeting held on December 26, 1941, and a resolution was adopted approving its form and authorizing and directing Seeligson as President of the company to execute the same in Transwestern's behalf, and authorizing and directing George W. Grant, as general counsel for the company, to deliver the same to Sinclair Prairie, and to accept delivery of the 10 notes of Consolidated Oil Company dated December 26, 1941, in the amounts and containing the provisions hereinbefore stated. At that meeting the Board of Directors also empowered and directed Seeligson as President or Herbert W. Grindal as Vice-president of the company to sell and assign the notes, without recourse, upon such terms and to such person or persons as might be for the best interests of the company, to receive payment for the same, and to deposit the proceeds to Transwestern's credit in the Central Hanover Bank & Trust Company or in some other bank with which Transwestern carried an account.

Accordingly, on December 26, 1941, Transwestern, by Seeligson as its President, executed the release and surrender which had been approved by the Board of Directors, releasing and surrendering the entire conditional claim against Sinclair Prairie. That release was delivered to Sinclair Prairie on December 27, 1941, and it in turn delivered to Transwestern its 10 notes for $330,000 each, dated December 26, 1941, in the amounts and containing the provisions hereinbefore stated.

17. Thereafter Seeligson, in Transwestern's behalf, undertook to negotiate or discount the 10 notes for $330,000 each which Transwestern had received from Consolidated, but was unable to do so upon satisfactory terms because of the denomination of the notes, the proposed purchasers stating that they would prefer that the notes be in smaller denominations. Seeligson reported that fact to Transwestern's Board of Directors at a meeting held on January 7, 1942, whereupon the Board adopted a resolution authorizing him or Grindal to surrender those notes to Consolidated, and procure in their place notes in smaller denominations aggregating $3,300,000, bearing the same date of December 26, 1941, and interest at 2% per annum, $330,000 of which should be payable each year. That was done.

18. Within a few days thereafter the substituted notes in the principal sum of $3,300,000 were sold through Dillon Reed & Company and Ritter & Company, Transwestern receiving therefor a net of $3,123,440.02 after deducting a discount and selling expense in the sum of $176,559.98. Transwestern thus suffered a loss of $31,280 upon the half interest in said conditional obligation which it purchased from plaintiffs, which loss it bore itself, and asserted no claim for reimbursement against the plaintiffs. With the money thus obtained, on January 13, 1942, Transwestern paid its entire outstanding note indebtedness which then amounted to $2,675,000, consisting of the note for $1,600,000 to Central Hanover Bank & Trust Company, $150,000 of notes maturing in 1942, and $925,000 of notes maturing in 1943 and later.

In its printed annual report to its stockholders for the year 1941, Transwestern set forth the fact of its purchase of plaintiffs' half interest in said conditional obligation and the amount paid therefor, its sale or release of the entire obligation to Sinclair Prairie for $3,300,000 of notes, the sale of those notes, the amount received therefor, its use of the money in retiring its indebtedness, and the amount of the loss which it suffered upon its purchase of plaintiffs' half interest.

19. In due time plaintiffs filed with defendant their several income tax returns for the year 1941, setting forth therein their sale to Transwestern of their half of Sinclair Prairie's conditional obligation as the sale of a capital asset, and the entire

amount received therefor as a capital gain, and they computed and paid their income taxes thereon at the capital gain rate. On April 26, 1943, the Commissioner of Internal Revenue sent to each of the plaintiffs a registered letter, in which he stated that the transaction under which plaintiffs together received $1,593,000 from Transwestern did not represent the sale of a capital asset, but represented the collection of a half interest in a contingent account receivable, and that the whole amount received by each of the plaintiffs constituted ordinary income and was taxable on that basis, and he therein assessed against the trust estate for Tom B. Slick, Jr., the additional sum of $198,236.67, and against the trust estate of Betty Slick Moorman the additional sum of $205,690.56, and against the trust estate of Earl F. Slick the additional sum of $205,683.20, and against Berenice Urschel the additional sum of $318,-567.79, all plus interest. Thereafter defendant mailed to each of plaintiffs a notice setting forth each of said deficiency assessments, and demanding that each pay the deficiency tax assessed and interest, in the following amounts, to wit:

The trust for Tom B. Slick, Jr. $239,396.58
The trust for Betty Slick
   Moorman ............... 248,398.12
The trust for Earl F. Slick.... 248,389.23
   and
For Berenice S. Urschel ..... 384,712.06

On September 7, 1945, pursuant to said notices and demands, and under compulsion of law, the plaintiffs paid to defendant the respective amounts demanded of them and stated above.

20. On October 1, 1945, the plaintiffs filed with defendant their several claims for the refund of the amounts paid by them on September 7, 1945, pursuant to said deficiency assessments, and they filed amended claims on April 1, 1946, the grounds being: (1) that the half interest in the conditional obligation had been owned and held by them more than five years, and was a capital asset in their hands, that the sale thereof to Transwestern was bona fide and complete, and that under the Revenue Code the amount received by them from said sale was a long term capital gain and was taxable only as such; (2) that the conditional obligation constituted part of the consideration for Slick's sale to Prairie, which was a sale of capital assets, and that the amounts then paid and thereafter to be paid Slick therefor were and would have been taxable against him only at capital gains rates, and that plaintiffs' half of said obligation had the same character and status in their hands that it would have had in Slick's hands if he had lived, and therefore that, even if Transwestern had not purchased but had only collected the conditional obligation for plaintiffs, still the same would have been taxable only at capital gains rates; and (3) that the right to receive said additional payment constituted an interest in the oil and gas leases sold to Prairie, in that the economic, consequences of the transaction was a reservation by Slick of oil in place to the extent of $6,000,000, conditioned only upon the gross production from the oil and gas leases sold equalling $30,000,000, which interest was a capital asset both in Slick's hands and in plaintiffs' hands. The claims and amended claims for refund were disallowed and denied on June 27, 1946.

21. Included in the deficiency assessments against the trust estates but not against Berenice S. Urschel, were some minor items of non-business expense which the Commissioner disallowed, in which disallowances the trustees acquiesced, but the taxes on said minor items are included in the sums for which plaintiffs sue. The sum disallowed as to the Earl F. Slick Trust was $282.92; as to Betty Slick Moorman Trust, $281.56; and as to the Tom B. Slick, Jr., Trust, $82.75. Plaintiffs, of course, are not entitled to recover the taxes paid on account of those sums; and to save the time and expense of recomputing the taxes upon the basis of including those items but treating the profit derived from the half interest in the conditional obligation as a capital gain, plaintiffs have elected to deduct from the sums sued for the full amount of those minor items which were disallowed, thus reducing the amounts which plaintiffs seek to recover to the following sums, to-wit:

608

Earl F. Slick Trust......... $248,106.31;
Betty Slick Moorman Trust.. 248,116.56;
Tom B. Slick, Jr., Trust.... 239,313.83;
Berenice S. Urschel ........ 384,712.06;
all with interest from September 7, 1945.

22. Plaintiffs' sale and Transwestern's purchase of plaintiffs' remaining half interest in the conditional obligation was intended by all the parties thereto to be and it was a bona fide and unconditional sale and purchase. The matter of Transwestern's acting as plaintiffs' agent in making a collection upon plaintiffs' half interest from Sinclair Prairie was never suggested or discussed between plaintiffs and Transwestern. There was no such arrangement. In dealing with Sinclair Prairie Transwestern was acting for itself and not as agent for plaintiffs. Plaintiffs' sale of said half interest to Transwestern was in fact what it purported to be in form. If Transwestern's transaction with Sinclair Prairie and Consolidated had fallen through, the sale from plaintiff to Transwestern would still have been effective and Transwestern would have been the owner of plaintiffs' half interest in the obligation.

23. While the conditional obligation had no ascertainable fair market value during the year 1929 and on the date of Slick's death in 1930, so that under the Internal Revenue Code and the Treasury Regulations it was not includable at any sum in Slick's income tax return for 1929 or in his estate tax return, nevertheless at all times it held the possibility of producing money for its owner and had substantial value in fact.

24. At all material times herein mentioned the market price for crude oil was approximately $1.25 per barrel.

25. Slick had owned all of the individual leases and all of his stock in Tom Slick, Inc., which he sold to Prairie Oil & Gas Company, for more than two years prior to March 14, 1929.

26. Slick did not make or purport to make any assignment to Prairie of the oil and gas leases owned by Tom Slick, Inc., but sold Prairie 100% of the capital stock of that company. Some delay occurred in Slick's delivery and Prairie's acceptance of that stock pending Slick's satisfaction and discharge of the liabilities of Tom Slick, Inc., but the possession, control and management of Tom Slick, Inc., was turned over to Prairie immediately upon or very shortly after the execution of the contract of March 14, 1929, after which Slick had nothing to do with the leases owned by Tom Slick, Inc., or with their operation. Slick made formal delivery of the stock in July, 1929, but Prairie had been in the possession, management and control of Tom Slick, Inc., and its assets since about March 22, 1929, and Prairie received the benefit of Tom Slick, Inc.'s operations from and after March 1, 1929. Tom Slick, Inc., still had title to all its leases and assets, when Slick formally delivered the stock therein to Prairie and it was not a mere shell at that time.

27. During the administration of Slick's estate, for convenience in handling its assets and affairs, the executors organized several corporations and transferred certain of the assets of the estate to them, and they also organized a holding corporation known as Tom Slick Properties, Inc., which held the stock of the various other corporations formed, and the executors held the stock of the holding corporation; but the conditional claim against the Prairie Oil & Gas Company for the additional sum of $6,000,000 was never transferred to and never became an asset of any or either of those corporations, but was retained by the estate. Those corporations were dissolved in 1932.

28. A partial distribution of the estate was made in 1932, in which was included the conditional obligation. In 1933 the trustees and Mrs. Urschel organized Slick-Urschel Oil Company as a corporation and transferred to it certain of the property distributed to the trustees and Mrs. Urschel, including Prairie Oil & Gas Company's conditional obligation, in exchange for all the stock of Slick-Urschel Oil Company, each trust and Mrs. Urschel acquiring the stock in the proportion of 1/3 to Mrs. Urschel and 2/9 to each of the trusts, and no other person, association or corporation having any interest in the corporation whatsoever. That corporation was dissolved in 1936, and its assets, including the conditional obligation, were distributed in

kind to its stockholders in proportion to their stock ownership and in cancellation of their stock. That the Commissioner of Internal Revenue had knowledge of and considered said facts at the time the claim for refund was denied. The conditional obligation had no fair market value at the time of its transfer to Slick-Urschel Oil Company and at the time of the latter's dissolution and the distribution of its assets. It had the same adjusted basis of zero at all times from the date of Slick's receipt of the conditional obligation up to and including the date of the distribution to its stockholders by Slick-Urschel Oil Company.

### Conclusions of Law

1. Plaintiffs' half of the conditional obligation had at all times actual substantial value, had the possibility of producing money for its owner, was subject to ownership, could be sold and transferred, and was enforcible in law. It was therefore "property" and a "capital asset" within the meaning of those words as used in sec. 117(a) of the Internal Revenue Code, 26 U.S.C.A. § 117(a).

2. The half interest in the conditional obligation was a capital asset in plaintiffs' hands; and, since plaintiffs had owned and held it for more than two years before selling it, the amount which they received for it was taxable only at the long-term capital gains rate and not as ordinary income.

3. Even if, instead of buying plaintiffs' half interest in said obligation, Transwestern had collected the same in plaintiffs' behalf, which the court has found not to have been the fact, nevertheless since Slick's transaction with Prairie was not closed and would not be closed until the conditional obligation was either paid or ascertained not to be payable, the said obligation was capital in character, and Transwestern's collection thereof in plaintiffs' behalf, or even plaintiffs' collection thereof directly, would not have rendered the proceeds taxable as ordinary income, but the proceeds would have been taxable only as a long-term capital gain.

4. Sinclair Prairie's conditional obligation did not constitute an economic interest of its holder in the oil and gas leases sold or in the oil produced therefrom.

5. The plaintiff trustees of the Earl F. Slick Trust are entitled to judgment against the defendant in the sum of $248,106.31 and interest thereon at 6% per annum from September 7, 1945. The plaintiff trustees of the Betty Slick Moorman Trust are entitled to judgment against the defendant in the sum of $248,116.56, and interest thereon at 6% per annum from September 7, 1945. The plaintiff trustees of the Tom B. Slick, Jr., Trust are entitled to judgment against the defendant for the sum of $239,-313.83, and interest thereon at 6% per annum from September 7, 1945. And plaintiff Berenice S. Urschel is entitled to judgment against the defendant for the sum of $384,712.06 and interest thereon at 6% per annum from September 7, 1945.